FILED

2022 Sep-28  PM 03:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

|                                    |     |                          |
|------------------------------------|-----|--------------------------|
| HEATHER MUELLER, *et al*.,         | )   |                          |
|                                    | )   |                          |
|     Plaintiffs,| )   |                          |
|                                    | )   |                          |
| v.                                 | )   | Case No. 1:20-cv-00029-SGC |
|                                    | )   |                          |
| SYLACAUGA HOUSING                  | )   |                          |
| AUTHORITY,                         | )   |                          |
|                                    | )   |                          |
|     Defendant. | )   |                          |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiffs Heather Mueller, Nicole Daniels, and Daniell Womack are former executive officers of defendant Sylacauga Housing Authority ("SHA"). (Doc. 1).[2] During their tenure, audits of SHA's records and financial statements revealed deficiencies in SHA's internal controls and procedures. Also during the plaintiffs' tenure, the U.S. Department of Housing and Urban Development ("HUD") alerted them to a possible misuse and misclassification of one of SHA's residential properties. In August 2019, the plaintiffs informed the SHA board of commissioners (the "Board") they had reported both issues to HUD and the housing classification issue to the Department of Justice ("DOJ"). The next month,

---

[1] The parties have unanimously consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 14).

[2] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

they were placed on administrative leave by a new acting executive director, and they were ultimately fired in November 2019.

The plaintiffs filed this action against SHA in January 2020, asserting claims for retaliation in violation of both the False Claims Act ("FCA") and the Fair Housing Act ("FHA"). (Doc. 1). Presently pending is SHA's motion for summary judgment on the plaintiffs' claims, which is fully briefed and ripe for adjudication. (Docs. 55-60; 63, 64). As explained below, SHA's motion is due to be granted in its entirety.

## I.    Standard of Review

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own

affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## II.    Facts and Procedural History

SHA is a public housing authority that owns and manages more than 600 residential housing units in Sylacauga and Talladega County. (Doc. 56-1 at 1). Founded in 1941, it provides housing to families, the elderly, and the disabled pursuant to laws and regulations administered by HUD. (*Id.*). SHA receives an operating subsidy and capital funds from HUD. (Doc. 56-3 at 12).

The Board oversees SHA, which is managed by an executive director responsible for running the day-to-day operations and supervising all other employees. (Doc. 56-8 at 3-4). In November 2017, the Board hired Michael Threatt as its executive director. (Doc. 56-17).

Threatt hired the plaintiffs in August and September 2018 to be new members of SHA's executive team. (Doc. 1 at 3). Mueller (the chief financial officer) and Daniels (the chief human resource officer) each initially received a $60,000.00 salary. (Doc. 56-3 at 9; Doc. 56-12 at 16). Womack, SHA's chief housing officer, received an initial salary of $65,000. (Doc. 56-13 at 7). By the time the plaintiffs were placed on administrative leave the next year, their salaries had significantly increased: Mueller's salary exceeded $107,000, Daniels's salary was $109,000, and Womack's salary was $120,000. (Doc. 56-3 at 9-10; Doc. 56-12 at 16; Doc. 56-13 at 8-9).

### A.    Audit and Forensic Review

The plaintiffs allege they became aware of potential issues with SHA's billing and procurement practices in September 2018. (Doc. 1 at 4). Along with Threatt, they searched for and selected vendors to conduct a forensic review and audit of SHA's practices and financial statements. (*Id.*).

Under the plaintiffs' leadership, SHA hired Henderson & Dejohn, LLC, to conduct an independent audit of SHA's financial statements for the year ending June 30, 2018. (Doc. 56-4). In Henderson & Dejohn's opinion, issued in March 2019, "the financial statements . . . present fairly, in all material respects, the respective financial position of the [SHA], as of June 30, 2018 . . .." (*Id.*at 7). In performing the audit, Henderson & Dejohnn considered SHA's internal controls,

and the audit revealed four major findings resulting from lack of controls or documentation:

- SHA was not properly monitoring its bank accounts to ensure its uninsured deposits were adequately collateralized. This resulted in an increased risk of loss of $176,986 of SHA's deposits and violated both HUD cash management policies and the Annual Contributions Contracts between HUD and SHA. (*Id.* at 27).

- SHA had poor internal controls over the tenant collection process, and it was not following its collection policy, leases, or HUD guidelines when handling tenant collections. SHA used repayment agreements, instead of late fees or eviction, to collect late rent over a period of months, resulting in excessive tenant account receivable balances and potential loss of tenant collections. Additionally, SHA may have charged tenants the wrong rents, late fees, or repayment agreement payments, or SHA might have missed certain tenant-related charges. (*Id.* at 28).

- SHA may have incurred unnecessary or unallowable costs. The audit questioned $67,644[3] in costs for a lack of supporting or procurement documentation, missing evidence of proper approval and segregation of duties for costs incurred, unallowable costs, and an inability to determine whether the costs were necessary and reasonable. This appeared to be caused by a lack of internal controls, including permitting the same employee to purchase and procure contracts, enter the information into the accounting system, and then prepare and sign the checks. (*Id.* at 29).

- The audit also questioned $44,516 in procurement costs.[4] SHA had not maintained sufficient internal controls to ensure it complied with 2 CFR part 215.40 through 215.48, which requires procurement transactions to be conducted in a manner to ensure open and free competition. The questioned costs lacked supporting procurement documentation that would have shown whether SHA procured goods and services through

---

[3] The audit tested $251,343 in costs; this questioned amount constitutes 27% of the total costs tested. (Doc. 56-4 at 29).

[4] The audit tested $251,343 in costs; this questioned amount constitutes 18% of the total costs tested. (Doc. 56-4 at 30).

free and open competition and which were reasonably priced, thus preventing federal funding waste. (*Id.* at 30).

The plaintiffs also selected and hired Borland Benefield, P.C., to conduct a forensic review of SHA for June 30, 2014-2018 to determine the legitimacy, reasonableness, and necessity of its transactions. (Doc. 56-5). Borland Benefield conducted the audit in November and December 2018, and the report was issued in February 2019.[5] (*Id.* at 5). Borland Benefield also reviewed a sample of tenant files from recent years to evaluate documentation relating to eligibility, accuracy of rent calculations, billing, and collections. (*Id.* at 4). Borland Benefield's forensic review considered SHA's "compliance with HUD and other regulations that guide the expenditure of federal award dollars" (*id.* at 2), and it found the following:

- Borland Benefield could not verify whether SHA adhered to its procurement policy and procedures for some credit card expenses. It identified some unallowed costs, including $1,414 in gift cards, an Amazon Prime subscription, an Ancestry.com subscription, late fees, and alcoholic beverages. There were also $971 in credit card charges that lacked documentation. (*Id.* at 7).

- Borland Benefield identified other unallowable costs, including $513 for door prizes at a conference, non-itemized meal receipts, medical expenses for a maintenance employee, and reimbursement travel costs paid to an employee who did not incur those costs. (*Id.* at 8).

- In many instances, tenant refunds were paid to an individual other than the tenant listed on SHA's rent register, and so it could not be determined whether these costs were allowable and authorized. Borland Benefield also could not verify whether SHA's practice of paying tenant referral

---

[5] The cover letter to the report is dated February 1, 2018, but given the dates the report was conducted, this date appears to be an error.

6

stipends was legitimate, reasonable, and necessary because it did not appear SHA struggled with occupancy issues. (*Id.* at 8-9).

- There were not sufficient records to verify whether SHA adhered to its procurement policy and HUD regulations for contract and labor services (other than SHA employees). SHA paid at least five vendors aggregate payments of more than $25,000 each/year, but no contract information was located for those vendors. Overall, the available information for vendor contracts was minimal and limited to contracts during the fiscal year ending June 30, 2018. (*Id.* at 9).

- There were also insufficient records to verify payroll disbursements were processed consistently and accurately. SHA's management could not locate documentation reflecting budgeted and approved salaries for the year ending June 30, 2018. Additionally, SHA lacked documentation showing it had approved pay rates for selected employee personnel files. (*Id.* at 10).

- A review of tenant files showed the files contained information necessary for SHA to verify income eligibility, and all participants were recertified at least once during the 12-month period. There were no instances in which the rent calculation did not match the amount charged to the tenant for the month of November 2018. (*Id.* at 11).

Both the audit and forensic review were addressed to the Board. (Doc. 56-4 at 7; Doc. 56-5 at 3).

### B. The Sylavon Properties

SHA manages residential units in three separate properties: Drew Court, Sylavon Court, and Sylavon Towers. (Doc. 56-1 at 2). The Sylavon properties were originally constructed and designated as housing for elderly and disabled

families,[6] and Drew Court housed families. (Doc. 56-23 at 58; Doc. 56-13 at 4, 14).

In February 2019, someone associated with HUD[7] told Mueller the Sylavon properties were designated in HUD's "PIC" system as general occupancy.[8] (Doc. 56-2 at 55; 56-2 at 16). According to the plaintiffs, this was a problem because SHA was only permitting disabled or elderly families to apply for housing at the Sylavon properties, and it did not permit other families to seek housing in these residences. (Doc. 56-13 at 14). None of the plaintiffs independently verified the designation of the Sylavon properties. (Doc. 56-2 at 56; Doc. 56-13 at 16; Doc. 56-11 at 20). According to SHA's records, the Sylavon properties were originally constructed and designated as housing for elderly and disabled families. (Doc. 56-23 at 58). SHA provided this documentation to HUD, which approved the re-designation of the Sylavon properties as elderly/disabled. (*Id.* at 58).

## C.   Head Start Childcare Program

SHA leased property to Talladega Clay Randolph Child Care Corporation, which owned and managed a Head Start childcare program. (Doc. 56-6). In May

---

[6] Per 24 C.F.R. § 5.403, the terms "family," "disabled family," and "elderly family" include a single person.

[7] The record indicates this individual may have been Vicki Gill or Staci Gilliam, the director of HUD's local field office. (Doc. 56-2 at 55; 56-16 at 72).

[8] The Sylavon properties were designated as elderly/disabled housing from their inception. The record is far from clear, but it appears HUD's records about their designation were changed at some point through software system upgrades, although the correct designation and use always remained elderly/disabled.

2019, Threatt and the plaintiffs decided to terminate the lease because it had not been properly procured and they were trying to bring all contracts into compliance with procurement guidelines. (Doc. 56-3 at 24; Doc. 56-7). On July 16, 2019, Threatt sent to Head Start a letter purporting to terminate the lease because of the presence of lead-based paint. (Doc. 56-6). Threatt also closed the daycare until further notice. (*Id.*).

The local community was displeased that the Head Start lease would be terminated, and there was some sort of protest. (Doc. 56-2 at 24). Another lead-based paint test was conducted, and Threatt instructed the daycare be reopened with HUD's approval on July 29, 2019. (Doc. 56-14).

### D.   The Plaintiffs' August 2019 Letter

On August 8, 2019, the plaintiffs wrote the following to the Board:

> This letter is to inform you that we, the SHA Executive Leadership Team, have reported the findings of the forensic audit and fiscal audit to HUD. Also, we have reported discrimination and segregation issues to the Department of Justice and Fair Housing. There will be multiple government agencies over the next several months investigating a variety of issues that SHA Executive Leadership Team has uncovered.

(Doc. 56-10). The plaintiffs' letter was addressed to Patrick Lozito, the Board's chairman, and Alma Jean Cook, the vice-chairman. (*Id.*) The record does not reflect whether the reports to HUD and DOJ were made in writing or orally, nor does it otherwise reflect the substance of these reports, the individuals to whom the reports were made, or when the reports were made. A few days later, the plaintiffs

met with Lozito to discuss the letter. (Doc. 60-5 at 20). Lozito thought the issues they reported were significant. (*Id.*at 24). He reached out to contacts at HUD, who reported "it would be a while before they could get back to [Lozito]." (*Id.* at 20).

In the plaintiffs' view, SHA mismanaged the funds it received from HUD, and the issues they reported involved this alleged mismanagement of funds. (Doc. 56-3 at 12; Doc. 56-11 at 9; Doc. 56-12 at 45). According to Mueller, SHA was the victim of fraud by third party vendors or employees, but SHA did not defraud anyone. (Doc. 56-3 at 13, 14, 60). Mueller did not know whether SHA had submitted any misleading reports to HUD, but she thought the "financials" may have been incorrect before she was employed and that any reports SHA submitted to HUD "could have been wrong." (*Id.* at 60). Mueller's employment was terminated before she determined whether this was the case. (*Id.*).

Womack similarly testified that the "fraudulent billing practices" she reported involved SHA's failure to follow procurement practices. (Doc. 56-13 at 14). She did not complain that SHA submitted a fraudulent claim or invoice to HUD but that SHA mismanaged the money it received from HUD. (*Id.* at 14-15). Womack was not aware of any false or fraudulent invoice SHA submitted to HUD. (*Id.* at 15). Likewise, Daniels testified the "fraud" involved mismanaging money SHA received from HUD. (Doc. 56-12 at 45). She did not know whether SHA sent any invoice to HUD. (*Id.*)

### E.   Sam Royster

In May 2018, Threatt hired Sam Royster as a part-time investigator. (Doc. 56-23 at 17). Royster worked about 16 hours a week for SHA. (*Id.* at 19). While he was employed part-time for SHA, Royster was also employed full-time with Alexander City Housing Authority as an investigator. (*Id.* at 14). As an investigator, Royster screened tenant applications for criminal backgrounds, patrolled SHA's properties, followed up on police reports, and recommended lease terminations when necessary. (*Id.* at 17). When he first started working for SHA, his office was at SHA's main offices, and he spent about half his working hours at the main office. (*Id.* at 20). In early 2019, Royster's office was moved to Drew Court. (*Id.* at 20). Once his office was moved, Royster spent less time at the main office, perhaps two to three hours a week. (*Id.* at 20).

Royster did not typically attend SHA's Board meetings, but Womack called him to come to the July 2019 meeting. (Doc. 56-23 at 20). Many people attended that meeting, and once Royster arrived, Threatt instructed him to remove the city council president if he said anything else. (*Id.*). SHA Commissioner Phillip Morris told Royster that if he removed the city council president, Royster would also have to remove Morris. (*Id.* at 30). After the meeting, Royster and Morris talked and exchanged phone numbers. (*Id.*). In the following weeks, Morris called Royster four or five times to obtain information in response to complaints from residents

about various issues, including poor property maintenance and the attempted termination of the Head Start lease. (*Id.* at 31). Royster also told Morris there was a lack of upkeep at SHA's properties, he had a negative impression of the executive team, and he did not approve of the way they operated SHA. (*Id.* at 31).

During their conversations, Morris asked Royster about his background because Royster appeared "to be a little more educated in public housing than [he] thought a security guard would actually be." (Doc. 60-2 at 8). Royster told Morris he had a master's degree in public housing and had once applied for the SHA executive director position. (*Id.* at 8, 12). After a few conversations, Morris realized Royster might be able to help SHA until they could hire someone permanently, so he recommended that Lozito speak with Royster. (*Id.* at 8).

On September 4, 2019, Lozito contacted Royster because Morris thought Royster had experience with housing projects. (Doc. 60-6 at 24). Lozito wanted to bring in someone as acting director who had previous knowledge of HUD. (*Id.* at 24). Royster and Lozito discussed the Board meeting scheduled for the following day, and Lozito asked Royster if he would accept the position of acting executive director. (Doc. 56-23 at 32). Royster said he would think about it, and Lozito asked him to meet for lunch the next day. (*Id.*). Royster was not surprised the Board was looking to replace Threatt because Threatt and the plaintiffs were rarely in the

12

office on the days Royster worked and other employees told him the executive team was frequently absent. (*Id.* at 33).

When they met for lunch the next day, Royster told Lozito he would accept the position. (*Id.*). Lozito did not ask Royster to do anything to be appointed as acting director. (*Id.*) Royster testified it was possible Lozito recommended he take certain actions once he was appointed, but Royster did not remember that. (*Id.*). Lozito did not recommend or instruct Royster to terminate the plaintiffs:

> Q. Did Patrick Lozito make a recommendation on that day or any other day that you terminate members of the executive team?
>
> A. I don't think so. If there was any conversation about that, it was probably me telling him that they needed to be terminated instead of him telling me.

(*Id.* at 35). Ultimately, Threatt was placed on administrative leave, and Royster was appointed as the acting director of SHA at the September 5 Board meeting. (*Id.* at 36).

### F.   Plaintiffs' Termination

When Royster and Lozito first discussed Royster becoming acting director of SHA on September 4, Royster knew he would terminate the plaintiffs' employment for several reasons because he believed things at SHA had started to go downhill when the plaintiffs' employment began and he had witnessed and heard from other SHA employees that the plaintiffs were often absent from work.

13

(*Id.* at 34, 39). Also, based on his experience with other housing authorities, Royster thought the plaintiffs' positions and high salaries were unnecessary:

> Q. So you didn't know whether – you didn't know whether [the plaintiffs'] positions were necessary?
>
> A. Oh, no, I did know their positions were not necessary.
>
> Q. Based on what?
>
> A. Because this Housing Authority had run very well for a lot of years before they came along. And I knew there was personnel here that was better than each of them that could do what they were doing better than they could do it. So it was very obvious to anybody that has been around a Housing Authority for any period of time that none of their positions was necessary and certainly not worth the amount of money they were getting paid. And it was highly, highly unusual for any – for a Housing Authority this size to have that many people making that much money.

(*Id.* at 44-45). He also believed many good employees were either fired or quit because they were tired of the way the plaintiffs ran SHA. (*Id.* at 46). Royster also offered more specific reasons for his decisions to terminate the plaintiffs.

- He decided to terminate Mueller because (1) he heard from the Comptroller that Mueller was incompetent, she did not know anything about housing, and she had attempted to hide an accounting error instead of addressing the error; (2) Mueller spent $64,000 to change SHA's housing software, but the change was not well implemented and employees were not trained on the new system; (3) Mueller moved SHA's deposits from local accounts to ones housed in Birmingham, costing $1,100 in monthly fees; and (4) on one occasion, Mueller would not allow Lozito to enter SHA's offices. (*Id.* at 39, 43).

- Royster decided to terminate Womack because (1) SHA's properties were not well-maintained, and residents and employees complained about maintenance; and (2) she had problems with and had alienated the police department. (*Id.* at 42, 72; Doc. 56-26).

14

- Royster decided to terminate Daniels because he thought she had been "going along with" Womack and Mueller. (Doc. 56-23 at 44). Royster had heard from other employees that they had been written up by the executive team and Daniels had been a part of it. (*Id.*).

Although Royster had already decided to terminate the plaintiffs' employment, he instead placed the plaintiffs on administrative leave on September 5, 2019, following a conversation with SHA's attorney. (*Id.* at 40; Doc. 60-7).

Royster was not aware the plaintiffs had reported alleged fraudulent billing practices or FHA violations to HUD or the DOJ. (Doc. 56-23 at 51). He did not attend the August 8, 2019 Board meeting. (*Id.* at 20, 62). Before his appointment as acting executive director, Royster only attended the July 2019 Board meeting. (*Id.* at 20, 62). According to the minutes of that meeting, there was no discussion of the plaintiffs' concerns about SHA's purportedly fraudulent billing practices or HUD violations. (Doc. 56-24).

### G.    Procedural History

The plaintiffs filed this action in January 2020. (Doc. 1). They seek back reinstatement or front pay, back pay and compensatory damages, punitive damages, and attorneys' fees, costs, and expenses. (Doc. 1 at 16).

SHA filed a counterclaim for breach of contract and conversion relating to the plaintiffs' alleged failure to return their SHA-issued electronic devices and artwork belonging to SHA. (Doc. 33). It seeks a declaration that Daniels and Womack's retention of their electronic equipment violated the confidentiality

agreement, as well as an order for specific performance to return SHA's devices and an award of attorneys' fees and costs. It also seeks to recover damages from the plaintiffs for Daniels and Womack's alleged conversion of the electronic devices and Mueller's alleged conversion of a pencil drawing signed by Jim Nabors (Doc. 33 at 24-26).[9]

## III.   Analysis

The plaintiffs allege their termination violates the anti-retaliation provisions of both the FCA (31 U.S.C. § 3730(h)(1)) and the FHA (42 U.S.C. § 3617). To establish a *prima facie* case of retaliation under either the FCA or FHA, the plaintiffs must show: (1) they engaged in statutorily protected conduct; (2) they suffered an adverse event; and (3) the adverse event was causally related to the protected conduct. *See Simon ex rel. Fla. Rehab. Assocs., PLLC v. Healthsouth of Sarasota Ltd. P'ship*, No. 21-11618, 2022 WL 3910607, at *5 (11th Cir. Aug. 31, 2022) (FCA); *Philippeaux v. Apartment Inv. & Mgmt. Co.*, 598 F. App'x 640, 645 (11th Cir. 2015) (FHA). This is the same framework as applied in Title VII cases. *See Simon*, 2022 WL 3910607 at *5; *Philippeaux*, 598 F. App'x at 645.[10]

---

[9] On October 13, 2021, the court entered an order denying Womack's motion for a protective order, granting SHA's motion to compel, and granting in part SHA's motion for sanctions. (Doc. 54). That order mistakenly referred to Federal Rule of Civil Procedure 34 as governing whether a deposition can be conducted remotely; it instead should have referred to Rule 30. (Doc. 54 at 1).

[10] *See also Fox v. Gaines*, 4 F.4th 1293, 1296 (11th Cir. 2021) (when interpreting the FHA, Eleventh Circuit looks to cases interpreting Title VII).

If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020). If the defendant does so, the burden shifts back to the plaintiff to show the proffered reason is merely a pretext to mask retaliation. *Id.*

SHA argues it is entitled to summary judgment for three primary reasons. First, the plaintiffs did not engage in protected activity because (1) the "fraudulent billing practices" about which they complained did not implicate conduct prohibited by the FCA and (2) the housing discrimination issues they reported to the FHA were first identified by the FHA. Second, Royster decided to terminate the plaintiffs' employment but was unaware of their complaints about billing fraud or housing discrimination, and so there is no causal connection between the plaintiffs' activity and their termination. Finally, Royster provided legitimate, non-retaliatory reasons for the plaintiffs' termination, and thus, the plaintiffs cannot establish their complaints about the fraud were the but-for cause of their termination.

In response, the plaintiffs contend (1) their report of SHA's fraudulent billing practices and housing discrimination was protected activity, (2) Royster's testimony he was unaware of their complaints is not plausible, and (3) even if Royster was unaware of the plaintiffs' activity, they can establish causation under

the cat's paw theory. They also argue there is a genuine issue of material fact about whether Royster's articulated reasons for their termination are pretextual.[11]

## A.   FCA Retaliation

The FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). FCA liability "'arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures.'" *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005). The FCA's anti-retaliation provision allows an employee to sue if she is discharged or suspended "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." *See* 31 U.S.C. § 3730(h)(1). Since the FCA's retaliation provision was broadened in 2009 and 2010, the Eleventh Circuit has not yet decided whether a plaintiff must show she had a "reasonable belief" her employer violated the FCA or that an FCA filing by either the employee or Government was a "distinct possibility" when the employee acted. *Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F.3d 1284, 1288-89 (11th Cir. 2021).

---

[11] The parties offer no argument about whether the plaintiffs' suspension with pay is an adverse action. Because the plaintiffs were ultimately terminated, the court will assume their September 5, 2019 suspensions were an adverse employment action. *See Hall v. Alabama State Univ.*, No. 2:16-CV-593-GMB, 2019 WL 137593, at *5 (M.D. Ala. Jan. 8, 2019) (finding suspension with pay plus termination is an adverse employment action).

Citing *Hickman*, SHA argues the plaintiffs did not engage in protected activity because the FCA does not prohibit the billing fraud they allegedly reported. (Doc. 57 at 26). Hickman was the executive director of Spirit of Athens, and in 2016, she sought to assist its accountant in filing tax forms for 2015. *Hickman*, 985 F.3d at 1285–86. In the process of the tax form preparation, Hickman learned about unspecified expenses and other financial discrepancies that concerned her. *Id.* She tried to discuss these concerns with Spirit of Athens's board of directors, but no discussion occurred. *Id.* She hired a firm to audit Spirit of Athens and informed the Board's president. *Id.* The president quickly fired the auditing firm, Hickman, and her assistant. *Id.* Hickman and her assistant sued, alleging they were fired in retaliation for attempting to combat the misuse of federal funds, which violated the FCA. *Id.* The district court entered summary judgment for Spirit of Athens, ruling the plaintiffs did not demonstrate they engaged in protected conduct because they did not show the "fraud" involved making false claims to the federal government. *Id.* at 1287.

The Eleventh Circuit affirmed, holding that under either a "distinct possibility" or the lower "reasonable belief" standard, the plaintiffs were, "at a minimum, required to show that the activity they were fired over had *something* to do with the False Claims Act—or at least that a reasonable person might have thought so. And the False Claims Act requires a false claim; general allegations of

fraud are not enough." *Id.* at 1289. This is because liability under the FCA requires the submission of a fraudulent claim to the government, not noncompliance with government regulations or improper internal procedures. *Id.* The court noted the FCA requires more than a suspicion of fraud or misuse of federal funds: "In order to file [a retaliation action] under the False Claims Act, an employee must suspect that her employer has made a false claim to the federal government." *Id.*

SHA argues, like in *Hickman*, the conduct the plaintiffs reported does not implicate the FCA. (Doc. 57 at 26). The plaintiffs reported SHA was mismanaging federal funds, had not followed proper procurement policies, and did not maintain sufficient checks and balances. But they also believed SHA may have been the *victim* of fraud by its employees and vendors.

The plaintiffs give this argument short attention, merely claiming they reported "fraudulent billing practices concerning the money HUD provided to SHA." They attempt to distinguish *Hickman* by suggesting SHA must provide HUD with yearly budgets and financials, which include SHA expenditures about which the plaintiffs complained. (Doc. 59 at 24). This is a fair point. In *Hickman*, Spirit of Athens received the federal funds without a claim to, or limits imposed by, the government. If the court were analyzing this argument in a motion to dismiss, it would likely win the day. However, the summary judgment standard requires the plaintiffs to come forward with *evidence* of a genuine issue of material

fact. And the plaintiffs do not direct the court to any documents or other evidence showing SHA made a false statement—or even a potentially false statement—to HUD. Instead, the only evidence in the record about the plaintiffs' FCA "complaint" is their August 8, 2019 letter, which states only that they "reported the findings of the forensic audit and fiscal audit to HUD." (Doc. 56-10). Because the plaintiffs do not cite the portions of either audit showing a potential false statement, the court must analyze the contents of those audits.

Henderson & Dejohn's audit revealed issues about a lack of controls and documentation for SHA's expenses, but it also concluded SHA's financial statements fairly presented, in all material respects, SHA's financial position. (Doc. 56-4 at 7). It did not address any statements SHA made to HUD or another governmental agency. Likewise, the forensic review revealed potential problems with procurement policies, but it did not raise concerns about any misstatements made by SHA to HUD or any other governmental agency. (Doc. 56-5). The audit and review reflect serious questions about lack of controls, procurement policies, documentation, and proper use of funds. But they simply do not imply SHA made any false claim to HUD or any other governmental agency. Consequently, the plaintiffs' report of the results of the audit and forensic review to HUD does not demonstrate they reported SHA submitted false or misleading budgets or financials, or any other false claim, to HUD.

Moreover, the plaintiffs describe their alleged protected activity as reporting "fraudulent billing practices," but the following exchange highlights that their complaint truly involved, at most, a potential misuse of federal funds:

> Q. In what context? Are you talking about fraud in connection with receiving funds from HUD or fraud in mismanaging the money –
>
> A. Mismanaging the money.
>
> Q. So mismanaging money SHA already had received from HUD.
>
> A. Correct.
>
> Q. So was there any fraud in connection with claiming money from HUD?
>
> Mr. Michel: Object to the form.
>
> A. I don't understand your question.
>
> Q. Was there a fraudulent bill sent to HUD?
>
> A. Like a payable? Like we are paying HUD, SHA?
>
> Q. No, no, no. You are asking for money from HUD. Was there any fraud in connection with a request for money from HUD?
>
> Mr. Michel: Object to the form.
>
> A. No.

(Doc. 56-3 at 11).[12] The plaintiffs may have sincerely believed SHA violated the FCA by mismanaging funds it received from HUD; however, as in *Hickman*, "a sincere belief is not the same thing as a reasonable one." *Hickman*, 985 F.3d at 1289. Again, liability under the FCA requires more than a misuse of federal funds

---

[12] A similar exchange occurred with Womack. (Doc. 56-13 at 15).

or poor internal controls—it requires the submission of a fraudulent claim to the federal government. *See id.*

The plaintiffs have not demonstrated a genuine issue of material fact about whether the reports described in their August 8, 2019 letter related to a potential false claim for payment to the federal government. Therefore, they have not established the "protected conduct" element of their *prima facie* case of retaliation under the FCA, and SHA is entitled to summary judgment on the plaintiffs' FCA retaliation claim.

### B.  FHA Retaliation

The FHA protects people from discrimination when they are renting or buying a home, seeking housing assistance, or engaging in other housing-related activities. 42 U.S.C. §§ 3601 *et seq.* Under the FHA, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.  The plaintiffs assert they were fired for reporting discrimination and segregation issues to HUD. (Doc. 1 at 6). They claim SHA sought to prevent families and African Americans from residing at the Sylavon properties because they were designated as elderly and disabled housing, despite HUD's records showing the properties were designated as family housing. (Doc. 1

at 7). Neither party analyzes the statutory requirements of FHA retaliation, leaving the court to discern the precise basis for the plaintiffs' claims.

Because the plaintiffs allege they were fired for reporting SHA's purportedly discriminatory conduct in providing housing to others, rather than to the plaintiffs, it appears their retaliation claim is based in the second part of § 3617—in other words, they claim they were fired because they aided or encouraged some other person in the exercise or enjoyment of the rights granted by §§ 3603 through 3606. Of those sections, it appears the conduct they reported—that SHA was improperly using the Sylavon properties as disabled and elderly, instead of general occupancy, housing to discriminate against African Americans—is addressed only in § 3604.[13] Section 3604(b) prohibits discrimination based on, among other things, race or family status in the terms, conditions, or privileges of the rental of a dwelling. Section 3604(d) prohibits representing to any person because of, among other things, race, handicap, or family status, that a dwelling is not available for rent when it is available.

### 1.  Protected Activity

The parties offer no authority detailing what activity qualifies as aiding or encouraging others under § 3617. As noted earlier, the only record evidence of the

---

[13] Section 3603 sets forth the effective date of §3604 and provides definitions and exemptions. Section 3605 prohibits certain discrimination for residential real estate-related transactions, such as loans, brokering, and appraisals. Section 3606 prohibits discrimination in the provision of brokerage services. The plaintiffs' reports to HUD about the misuse of the Sylavon properties do not relate to any of these sections of the FHA.

24

purported protected activity is the plaintiffs' August 2019 letter stating they reported discrimination and segregation issues to the DOJ and HUD. Without the underlying complaints, or even testimony describing the basic details of the substance and circumstances of the plaintiffs' alleged complaints, this vague description is difficult to analyze.

SHA argues the plaintiffs did not engage in protected activity because HUD informed the plaintiffs of the Sylavon properties' designation, not the reverse; the plaintiffs simply relayed this information to the Board. The plaintiffs do not address this argument, other than to make the conclusory assertion their August 2019 letter and reports to Lozito are protected activity. SHA's argument has logical appeal, but it cites no authority holding this fact pattern prevents a finding of protected activity. Additionally, SHA does not address the plaintiffs' contention, although apparently unsubstantiated in the record, that they reported these issues to the DOJ. For purposes of resolving this motion, the court will assume the plaintiffs have met this prong of their *prima facie* case.[14]

---

[14] The plaintiffs do not cite evidence supporting their allegation that SHA used the Sylavon properties to exclude tenants based on family status or race. Even if the properties were improperly designated—and the undisputed evidence shows they were designated as disabled and elderly housing from their inception—the court doubts a mistake in designation equates to discrimination.

## 2.   Causation

### a.  Standard of Proof

Before proceeding to the parties' arguments about causation, the court must address the proper standard of proof for causation under the FHA retaliation statute.[15] The parties offer no authority or argument about whether the plaintiffs must prove their FHA-related reports were a motivating factor in their termination or whether they must satisfy the higher burden of but-for causation. The relevant statutory text provides: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person . . . *on account of* his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. It appears the Eleventh Circuit has not yet addressed this issue.

In 2009, the Supreme Court held the phrase "*because of* . . . age" in the Age Discrimination in Employment Act ("ADEA") requires an ADEA plaintiff to prove but-for causation. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). In analyzing the statutory text, the Court explained the ordinary meaning of "because of" " is "by reason of" or "*on account of.*" *Id.* at 176 (citing 1 Webster's Third New International Dictionary 194 (1966); 1 Oxford English Dictionary 746 (1933);

---

[15] Like retaliation in Title VII cases, the plaintiffs must establish a causal connection between the retaliation and their FCA-protected activity by showing it was the "but for" cause of the retaliation. *See Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1359 (11th Cir. 2020).

The Random House Dictionary of the English Language 132 (1966)). In 2013, the

Court considered the differences in Title VII's prohibitions on discrimination and

retaliation. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). Title

VII's nondiscrimination language makes an employment practice unlawful if

membership in a protected class "was *a motivating factor* for any employment

practice, *even though other factors also motivated the practice.*" 42 U.S.C. §

2000e-2(m).  The anti-retaliation provision's "because" language, however,

indicates a different, higher standard of causation:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees . . . *because* he has opposed
> any practice made an unlawful employment practice by this
> subchapter, or *because* he has made a charge, testified, assisted, or
> participated in any manner in an investigation, proceeding, or hearing
> under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added). Like *Gross*, *Nassar* concluded the use of

"because" in the statute's language required Title VII retaliation claims to be

proved through but-for causation. 570 U.S. at 360. The Court cited with approval

its prior explanation that "the ordinary meaning of 'because of' is 'by reason of' or

'on account of.'" *Id.* at 350 (internal citations omitted).

The FHA prohibits retaliation "on account of" an individual having aided or

encouraged any other person in the exercise of a right granted by the FHA. 42

U.S.C. 2317. As the Supreme Court has observed, "on account of" has the same

textual meaning as "because of." *Gross*, 557 U.S. at 176. Therefore, the court

27

concludes the FHA's retaliation provision requires the plaintiffs to prove their protected activity was the but-for cause of their termination.[16]

### b.  Royster's Lack of Knowledge and Cat's Paw Theory

SHA argues the plaintiffs cannot establish a causal connection between their complaints and their termination because they were terminated by Royster, who was not aware they had reported any issues to HUD. (Doc. 57 at 26). The plaintiffs counter that (1) the temporal proximity of their protected activity and termination demonstrates causation, and (2) Royster's testimony he was unaware of their complaints is not plausible. (Doc. 59 at 27). The plaintiffs allege (1) Royster impermissibly communicated with Board members about them and other SHA matters;[17] (2) they raised their complaints during several public Board meetings; (3) and Royster's reasons for terminating them are baseless.

The close temporal proximity of the August 8, 2019 letter to the Board and the plaintiffs' September 5, 2019 termination could demonstrate a causal connection. However, as SHA notes, unrebutted evidence that the decision maker was unaware of the employee's protected conduct means that temporal proximity

---

[16] Other courts to consider this question recently have reached the same conclusion. *See Kris v. Dusseault Fam. Revocable Tr.*, No. 18-CV-566-LM, 2022 WL 867990, at \*5 (D.N.H. Mar. 23, 2022) (holding FHA retaliation is subject to but-for causation); *Taylor v. Nat'l Invs., Ltd.*, No. CV 17-117 WES, 2022 WL 306367, at \*7 (D.R.I. Feb. 2, 2022) (same); *Campos v. HMK Mortg., LLC*, 458 F. Supp. 3d 517, 532 (N.D. Tex. 2020) (same).

[17] Per SHA's bylaws, it is not the Board's responsibility to make day-to-day-management decisions, and the Board's sole connection to the operations of SHA is through the chief executive officer. (Doc. 56-8 at 1). The Board is not involved in personnel actions other than the chief executive officer. (*Id.*).

alone does not create a genuine issue of material fact—a decision maker cannot have been motivated to retaliate by something unknown to him, even where the two events happened close in time. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020).

The plaintiffs attempt to rebut Royster's testimony by challenging his credibility, but a credibility challenge alone does not create a genuine issue of material fact. *See Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (Once a defendant has moved for summary judgment, "the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden . . ..”). The plaintiffs' arguments for rejecting Royster's testimony are unpersuasive. First, they do not explain why Royster's "impermissible" communication with Board members shows, or even implies, he knew of the plaintiffs' complaints. Royster, Lozito, and Morris all testified they did not discuss the plaintiffs' complaints before Royster decided to fire them on September 5, 2019. There is also no evidence that Royster had any knowledge of the bylaws before his appointment as acting executive director. Second, the plaintiffs neither identify the Board meetings at which they raised their complaints nor submit evidence showing Royster attended those meetings. Royster testified that the only board meeting he attended before his appointment as executive

director was the July 2019 meeting, and the plaintiffs do not offer evidence to rebut this testimony. Finally, as discussed below in addressing the arguments regarding pretext, the plaintiffs do not submit evidence that shows a genuine dispute about whether they engaged in the conduct that caused Royster to terminate them.

The plaintiffs next attempt to establish causation under a "cat's paw" theory. They contend Lozito wanted to fire them so he could impermissibly direct SHA funds to his friends and business partners:

> Notably, before Royster's appointment to [] acting executive director, Lozito did [not] hire any friends or business partners to work for SHA. However, while Royster was acting executive director, Lozito, in violation of HUD regulations and the SHA By-Laws, 1) hired a part time assistant; 2) hired a handyman that Lozito used personally; 3) Contracted with an IT Company owned by Lozito's business partner, and the list goes on. Plaintiffs spent their tenure with SHA attempting to rid it of improper procurements, which was extremely problematic for Lozito. So, Lozito replaced Threatt and made sure his replacement, Royster, owed Lozito for the appointment. Which opened the door for Lozito to obtain pecuniary and non-pecuniary benefits for his friends and business partners.

(Doc. 59 at 28).

The cat's paw theory allows a plaintiff to establish causation by showing the decisionmaker followed a biased recommendation without independently investigating the complaint against the plaintiff. *See Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015). The employee must show "(1) a supervisor performed an act motivated by animus that was intended to cause an adverse employment action; and (2) the act was a proximate cause of the

30

adverse employment action." *Id.* (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). However, the Eleventh Circuit has "indicated that, while the cat's paw theory may be appropriate in cases in which the plaintiff is required to prove only that the protected characteristic was a motivating factor, such as in Title VII disparate treatment claims, the theory is inappropriate when the statute requires but-for causation." *Duncan v. Alabama*, 734 F. App'x 637, 640 (11th Cir. 2018) (citing *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335–36 (11th Cir. 2013)). As set forth above, the plaintiffs must show their FHA activity was the but-for cause of their termination, and so it appears a cat's paw theory will not satisfy this standard.[18, 19]

Even assuming the cat's paw theory applies to the plaintiffs' FHA retaliation claims, the plaintiffs have not presented evidence to support their theory. Their argument that Lozito influenced Royster to fire them so he could use SHA's funds to enrich his friends and business partners in no way demonstrates he harbored any retaliatory animus because of their reports about the Sylavon properties. Further,

---

[18] As discussed above, the plaintiffs did not engage in activity protected by the FCA; however, even if they had, they must show their protected FCA activity is the but-for cause of the alleged retaliatory act. *Nesbitt*, 945 F.3d at 1359. Consequently, they may not proceed under a cat's paw theory for their FCA retaliation claim. *See also Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (noting the Eleventh Circuit has not applied the cat's paw theory in an FCA retaliation case).

[19] The court also questions whether a cat's paw theory—premised on an employer's vicarious liability for the acts of its agents (*see Sims*, 704 F.3d at 1336)—can be applied to this particular fact pattern, where a plaintiff claims an employer's board member, rather than one of its employees, sought to improperly influence an employment decision.

the record does not suggest Lozito made any recommendation to Royster about their employment; it reflects the reverse:

> Q. Did Patrick Lozito make a recommendation [on September 5, 2019] or any other day that you terminate members of the executive team?
>
> A. [Royster] I don't think so. If there was any conversation about that, it was probably me telling him that they needed to be terminated instead of him telling me.

(Doc. 56-23 at 35). The plaintiffs speculate that Lozito and Royster may have secretly discussed their termination, but they cite no evidence that would permit such an inference. Neither do they provide authority where a court rejected evidence in favor of a party's conjecture. Absent evidence that might show Lozito had any retaliatory animus and influenced Royster's decision to terminate the plaintiffs' employment, the plaintiffs cannot proceed under a cat's paw theory.

SHA has established there is no genuine issue of material fact about whether Royster was aware of the plaintiffs' report of potential HUD issues, and the plaintiffs have not brought forth evidence that either rebuts Royster's testimony or shows a cat's paw theory might apply. Because the plaintiffs cannot demonstrate a causal connection between their reports of FHA discrimination and their termination, they cannot establish a *prima facie* case of FHA retaliation, and SHA is entitled to summary judgment on this claim.

### 3.   Pretext

Assuming the plaintiffs could demonstrate a *prima facie* case of retaliation, the burden would then shift to SHA to articulate a legitimate, nondiscriminatory reason for their termination. SHA's burden at this stage can involve no credibility determination and is "exceedingly light." *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993); *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). SHA must only articulate a "clear and reasonably specific" non-discriminatory basis for its actions. *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981). The burden at this stage is one of production, rather than of proof. *Perryman*, 698 F.2d at 1142.

Royster offered many reasons for his decision to fire the plaintiffs. Based on his experience with other housing authorities, he thought the plaintiffs' positions and high salaries were unnecessary. Employees had reported to him that the plaintiffs were often absent from work. He believed many good employees were either fired or quit because they were tired of the way the plaintiffs ran SHA. And, as detailed above in Section II.F, he offered more specific issues he had with each of the plaintiffs. These reasons for termination are clear and specific, they are non-retaliatory, and they are well within SHA's business judgement. SHA has therefore established legitimate, non-discriminatory reasons for the plaintiffs' termination.

If an employer articulates one or more legitimate, non-discriminatory reasons for the employment action, the plaintiff must show the proffered reason was pretext for retaliation. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024–25 (11th Cir. 2000). Where, as here, the proffered reason is one that might motivate a reasonable employer, the plaintiffs cannot quarrel with the wisdom of the reason or substitute her business judgment for that of SHA; they must instead "meet that reason head on and rebut it." *See id.* at 1030. To demonstrate pretext, the plaintiffs must show both (1) Royster's proffered reasons were false *and* (2) retaliation was the real reason for their termination. *See Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). The pretext inquiry centers on the employer's belief, not the employee's belief. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

The plaintiffs do not meet this burden. They claim they did not undertake the conduct cited by Royster, but even if they did, their conduct did not violate any written SHA policy. The plaintiffs do not offer any testimony or evidence disputing each of the reasons Royster gave for their termination, and so this bare assertion, which wholly lacks factual support, fails to meet Royster's termination reasons "head on and rebut [them.]" *See Chapman*, 229 F.3d at 1025. The plaintiffs also complain they were not afforded progressive discipline before their termination and the investigation conducted while they were on administrative

leave is a sham. Again, the plaintiffs do not present any evidence showing SHA had a progressive discipline policy or that they were otherwise entitled to progressive discipline. Nor is there any evidence about the substance of the investigation during their administrative leave. As noted above, the court assumes their September 5 suspension is the relevant adverse event, and so the investigation following that date would not be relevant.

Even if the plaintiffs showed some real dispute about Royster's proffered reasons for their termination, they do not meet their burden to demonstrate pretext unless they show *both* that the reasons were false *and* that retaliation was the real reason. *See Gogel*, 967 F.3d at 1136. The plaintiffs' arguments focus only on challenging Royster's reasons for their termination; they wholly ignore the requirement to come forth with evidence demonstrating retaliation was the true reason for their termination. As best the court can tell, the only evidence of Royster's (or even Lozito's) retaliatory animus is the temporal proximity between their August 2019 letter and their suspension/termination. The Eleventh Circuit has held "while close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient." *Id.* at 1138, n.14. (citing *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1328 (11th Cir. 2020) (temporal proximity of less than two months was insufficient by itself to establish pretext);

*Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (the close temporal proximity of two weeks was evidence of pretext but "probably insufficient to establish pretext by itself"); *Wascura v. City of South Mi*ami, 257 F.3d 1238, 1244–45 (11th Cir. 2001) (a three and one-half month period between the employee's protected conduct and her termination was, standing alone, insufficient to demonstrate pretext)).

The plaintiffs have not offered evidence to show a genuine issue of material fact *both* that Royster's legitimate, non-discriminatory reasons for their termination were false *and* that retaliation was the true cause of their termination. Accordingly, SHA is entitled to summary judgment on the plaintiffs' FHA retaliation claim.

## C.   SHA's Counterclaim

SHA's counterclaim invokes this court's supplemental jurisdiction under 28 U.S.C. § 1367. (Doc. 33 at 20). A federal district court may exercise supplemental jurisdiction over state law claims that are so related to claims in an action over which it has original jurisdiction as to "form part of the same case or controversy under Article III of the United States Constitution." § 1367(a). However, federal law permits a district court to decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). When determining whether to decline the exercise of supplemental jurisdiction under § 1367(c)(3), a court should consider judicial economy,

convenience, fairness to litigants, and comity. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988).

The court had original jurisdiction over the plaintiffs' claims for FCA and FHA retaliation; however, SHA's claims are based on state law. SHA's motion for summary judgment does not address its counterclaims. The plaintiffs have not moved for summary judgment on the claims against them, and the deadline to do so has long since passed. (Doc. 44). The parties will be directed to submit arguments to the court addressing whether it should continue to exercise supplemental jurisdiction over SHA's counterclaim.

## IV.    Conclusion

For all the foregoing reasons, viewing the facts in the light most favorable to the plaintiffs, there are no genuine issues of material fact, and SHA is entitled to judgment as a matter of law. Accordingly, SHA's motion for summary judgment will be **GRANTED** in its entirety and all the plaintiffs' claims are **DISMISSED WITH PREJUDICE**. (Doc. 55).

The parties are **ORDERED** to submit, within **twenty-one (21) days** of the date of entry of this order, arguments and authority regarding whether this court should exercise supplemental jurisdiction over the plaintiffs' counterclaims.

**DONE** this 28th day of September, 2022.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE